**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 2:13-cv-00047-MR-DLH**

| | | |
|---|---|---|
| **PEGGY HILL and AMY WALKER,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | <u>**MEMORANDUM OF**</u> |
| | ) | <u>**DECISION AND ORDER**</u> |
| | ) | |
| **BARRY COGGINS and COLLETTE** | ) | |
| **COGGINS, d/b/a CHEROKEE BEAR** | ) | |
| **ZOO, and COGGINS & COGGINS,** | ) | |
| **INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court following a bench trial on September 17 and 18, 2015. Upon consideration of the testimony and evidence presented by the parties, the Court hereby enters the following Findings of Fact and Conclusions of Law.

## PROCEDURAL BACKGROUND

The Plaintiffs Peggy Hill and Amy Walker initiated this citizen suit on December 3, 2013, against the Defendants Barry Coggins and Collette Coggins, collectively doing business as Cherokee Bear Zoo ("CBZ" or "Zoo"), alleging various violations of Section 11(g)(1)(A) of the Endangered Species

Act, 16 U.S.C. § 1540(g)(1)(A) ("ESA").[1]  [Doc. 1].  As asserted in their Amended Complaint, the Plaintiffs allege that the Defendants' past and ongoing practice of keeping four adult grizzly bears, as well as grizzly bear cubs, in undersized, virtually barren and archaic concrete pits and/or undersized cages constitutes an unlawful "taking" and unlawful possession of a "taken" threatened species (Counts One and Two), and that the Defendants' practice of acquiring and/or disposing of grizzly bear cubs in interstate or foreign commerce in the course of a commercial activity violates the ESA (Count Three).  [Doc. 30].

The Defendants moved for summary judgment on all of the Plaintiffs' claims, arguing *inter alia* that the Plaintiffs lacked standing to bring these claims and further that none of the bears at the CBZ are an endangered species within the meaning of the ESA.  [Doc. 41].  The Court denied the Defendants' motion for summary judgment on August 13, 2015.  [Text-Only Order entered Aug. 13, 2015].

---

[1] The Plaintiffs also brought suit against Coggins & Coggins, Inc. The evidence presented at trial indicates that Coggins & Coggins, Inc. was administratively dissolved in 2010, and that it did not own or operate the CBZ during any time period relevant to this case. [Plaintiffs' Ex. 27 at 20].  Accordingly, the Plaintiffs' claims against Defendant Coggins & Coggins, Inc. shall be dismissed.  All references to "Defendants" in findings of fact and conclusions of law shall apply to Barry Coggins and Collette Coggins only.

This matter thereafter proceeded to a bench trial.  Upon conclusion of the presentation of evidence, the Court directed the parties to file supplemental briefs on various legal issues raised during the trial.  The parties filed their briefs on November 24, 2015 and December 8, 2015, respectively.  [Docs. 89, 90].  Having been fully heard and briefed, this matter is ripe for disposition.

## FINDINGS OF FACT

### A.    The Parties

1.    The Plaintiffs Peggy Hill and Amy Walker are enrolled members of the Eastern Band of Cherokee Indians ("EBCI").  [T. 18, 100].  Both Plaintiffs reside within the Qualla Boundary in Cherokee, North Carolina.  [T. 16, 98].

2.    Defendants Barry Coggins and Collette Coggins have owned and operated the CBZ, an unaccredited roadside zoo in Cherokee, North Carolina, for over twenty years.  [T. 411, 415].

3.    There are approximately 35 animals currently at the CBZ, including brown bears, black bears, monkeys, lemurs, goats, and a tiger.  [T. 67, 203].

**B.    The Plaintiffs' Standing**

4.    The Plaintiffs, like many members of the EBCI, have deep cultural and spiritual connections with wildlife, and bears in particular, as they hold a special place in Cherokee culture.  The Plaintiffs were taught to have an aesthetic appreciation for seeing bears living in the wild as well as bears living under natural and humane conditions.  The Plaintiffs hold a core cultural belief that all things are connected in the overall environment and that all wildlife, including bears, should be allowed to live in harmony.  [T. 20-21, 102-03].

5.    The Plaintiffs first became aware that the bears in question were being held at the CBZ in January 2013 when they watched a video online that depicted the conditions of bears in various roadside zoos located within the Qualla Boundary, including the CBZ.  [T. 27, 103; Pl. Ex. 1].  Watching this video prompted the Plaintiffs to appear before the Tribal Council and propose a resolution to prohibit keeping bears in captivity within the Qualla Boundary.  [T. 39-40, 104].  The Tribal Council, however, tabled the proposed resolution.  [T. 42].

6.    On March 28, 2013, the Plaintiffs, along with Jodi Taylor and Jan Adams, visited the CBZ.  [T. 44, 105].  They observed a sign on the CBZ premises advertising grizzly bears.  [T. 107].  Near the entrance,

the Plaintiffs observed a black bear cub in a "bird-like" cage.[2]  [T. 108].

The Plaintiffs proceeded to the two bear pits where the four brown

bears were located.  The signs near the pits indicated that all four bears

were grizzly bears.  [T. 45].  The pits were concrete, with no vegetation

and no shade.  There was a small concrete pool of water in each pit.

[Id.].  As Ms. Hill observed:

> [T]he bears were pacing.  And one was just lying
> there unable to get up – or it would look like to me
> not having the energy to get up or was overcome with
> heat, I don't know.  The other was begging for food.
> It would jump up on the wall and then it would go
> around and around and come back and make its
> begging noise.  It wasn't a growl.  And the same was
> with the other two that was adjacent to those; they
> were just smaller.  There was nothing that – even
> there was nothing that even could stimulate those
> bears in that zoo in the pit.  And it was total concrete.

[T. 45-46].  Ms. Walker observed that there were apples and dry bread

available for purchase.  [T. 108].  Ms. Hill observed other patrons

feeding the bears apples and bread.  [T. 46].

7.     Ms. Hill observed that the bears were "listless," that "[t]heir eyes, their

spirit, all were just empty," and that in her mind the bears were

---

[2] Black bears are neither an endangered nor a threatened species.  Thus, the treatment of this black bear cub is not a subject of this litigation.  There was no evidence presented at trial to suggest that grizzly bear cubs were subjected to this type of treatment.

suffering from "not having the freedom to move about as bears do ...."
[T. 47]. She also observed that the bottom of the bears' feet were scarred and red. [T. 70].

8.    Ms. Walker also observed that one of the bears

> just laid there and would look over at us. But the other one stood up, and it was like it was expecting me to throw food to them. And then there were other people who came and [who] did. But even that one that was laying down didn't even get up or try to get the food.
>
> But when you looked at them they were so lethargic and maybe their eyes were just vacant. They didn't look like they had a life – life in their eyes, and that – that was what – that's the most hurtful part to see of animals suffering. And to me I would call it depression.

[T. 108]. Ms. Walker did not stay more than fifteen or twenty minutes because seeing the bears in this state upset her. [T. 109, 120, 123]. As Ms. Walker entered the gift shop, a zoo employee offered to take her picture with the black bear cub. Ms. Walker declined, explaining that "it reminds me of what happened to my ancestors and my mom being put in boarding school as children and never being able to see

their parents for nine months out of the year, and some of them never, ever came home." [T. 109].[3]

9. Ms. Hill observed the bears for approximately thirty minutes. [T. 68]. She was "very angry" and "saddened" by what she observed at the Zoo. She felt an "identification" between the treatment of these bears and the historical treatment of the Cherokee people. [T. 47, 48]. Ms. Hill has not returned to the CBZ since her visit on March 28, 2013 because the bears' suffering would make it "too painful." [T. 48, 54]. Ms. Hill would, however, visit the bears again if they were moved to a more natural and appropriate environment. [Doc. 49, 89-90].

10. Ms. Walker did not observe the bears very long because it was "just too painful." [T. 106]. Following her visit to the CBZ, Ms. Walker, who is a diabetic, experienced very high blood sugar levels and had to start taking insulin shots daily. [T. 123-24].

11. Ms. Walker has not returned to the CBZ since March 28, 2013, and she has no definite plans to return so long as the Zoo is at its current

---

[3] Corey Coggins, the Defendants' son, was working in the Zoo's gift shop on the day of the Plaintiffs' visit. [T. 400]. He offered to take pictures of the Plaintiffs with the baby bear, which they declined. Mr. Coggins reported, however, that he had a "nice visit" with the Plaintiffs. He observed that the Plaintiffs were laughing and joking, and that they made no negative comments or criticism about their experience at the Zoo. [T. 402-03].

location.[4]  [T. 109].  She would be willing to return to visit the bears, however, if they were placed in a more humane habitat.  [T. 110, 112]. If the Defendants created such a habitat for the bears, Ms. Walker "certainly would go."  [T. 113].

### C.    The Identity of the Subject Bears as Grizzly Bears

12.    The CBZ currently possesses, and has possessed for at least the past fifteen years, four bears that are the subject of this litigation, named Elvis (male), Marge (female), Lucky (male), and Layla (female).  [T. 424-27].

13.    The Defendants have made numerous representations over the years that the subject bears are grizzly bears.  For example, the CBZ's website has a "Grizzlies Page," which identified the subject bears as grizzly bears.  [Plaintiffs' Ex. 29].  There were signs at the CBZ facility identifying at least three of the four bears as grizzly bears.  [Plaintiffs' Ex. 30].

14.    Further, an October 23, 1997 USDA inspection report reflects an animal inventory of nine bears housed at the CBZ, including one

---

[4] In fact, other than her singular visit to the CBZ, Ms. Walker has been to only one other zoo in her life, when she went to a zoo in Sydney, Australia almost twenty years prior. That visit, she testified, was also an upsetting experience for her.  [T. 111-12].

grizzly bear.  [Plaintiffs' Ex. 76].  USDA records indicate that the CBZ represented having one "Silver Tip Grizzly Bear" in 1998.  [Plaintiffs' Ex. 28].[5]

15. A March 10, 2000 certificate of veterinary examination, which was certified by both Barry Coggins and Dr. Ackerman, indicates the shipment of two "grizzly bear" cubs from the CBZ to another facility. [Plaintiffs' Ex. 32].

16. A May 23, 2002 certificate of veterinary examination, which was certified by both Barry Coggins and Dr. Ackerman, indicates the shipment from the CBZ to another facility of a female "grizzly bear" cub, which was the offspring of Marge and Elvis.  [Plaintiffs' Ex. 33].

17. A March 30, 2009 certificate of veterinary examination, which was certified by both Barry Coggins and Dr. Ackerman, indicates the shipment of three "grizzly bear" cubs from the CBZ to another facility. [Plaintiffs' Ex. 34].   During this time period, the only female brown bears at CBZ were Marge and Layla.  [T. 499].

---

[5] The Defendants objected to the introduction of these exhibits, as well as others [e.g., Plaintiffs' Exs. 31, 32, 33, 34, 35, 42, 43, 44], as being too remote in time to be relevant to the present enforcement action.  The Court held such objections in abeyance pending the Court's review of certain deposition testimony.  Having now reviewed such testimony, the Defendants' objections in this regard are overruled.

18. In a November 2, 2010 USDA inspection report citing hair loss on Layla, she is identified as a grizzly bear. [Plaintiffs' Ex. 75].

19. The CBZ's veterinarian, Dr. David Ackerman, commonly referred to these four bears as grizzly bears in his veterinary records. [T. 580-81; Plaintiffs' Ex. 35].

20. In March 2000, Mr. Coggins was issued a citation by the United States Fish & Wildlife Service for unlawfully selling grizzly bear cubs in interstate commerce. [Plaintiffs' Ex. 27 at 121-22].

21. The Plaintiffs' expert witness, Else Poulsen, testified that the appearance of each of the subject bears is consistent with that of grizzly bears. Ms. Poulsen has over 30 years of experience as a zookeeper and animal behaviorist, with most of that time being spent in the study of captive brown bears, including grizzly bears. [Plaintiffs' Ex. 37 at 9-20; Plaintiffs' Ex. 39].

22. Ms. Poulsen further testified to a reasonable degree of scientific certainty that the bears appearing in videos disclosed by Defendants on July 29, 2015, are grizzly bears based upon the characteristic hump between their shoulders. [Plaintiffs' Ex. 37 at 112-19]. She testified that of the 17-20 recognized subspecies of *ursus arctos*, only grizzly bears (*ursus arctos horribilis*) have this distinctive hump. [Id.

at 178].  She further testified to a reasonable degree of scientific certainty that the subject bears are not European brown bears (*ursus arctos arctos*), as claimed by the Defendants.  [Id. at 121].[6]

23.  Plaintiffs' second expert witness, Edward Ramsay, D.V.M., also testified that the appearance of these four bears is consistent with that of grizzly bears.  [Ramsay Declaration, Doc. 50-11 at ¶ 5].  Dr. Ramsay is a Professor of Zoological Medicine at the University of Tennessee College of Veterinary Medicine and is board certified by the American College of Zoological Medicine.  [Plaintiffs' Ex. 61; Tr. 217-18].

24.  Dr. Ramsay based his opinion primarily on two factors.  First, he noted that the documents prepared by the owners, including the health certificates, identified these bears as grizzly bears until 2009, after which they were referred to as either "Eurasian" or "European" brown bears, neither of which is an endangered or threatened species.  [T. 231-32].  Second, he based his opinion on the "noticeable humps" that

_____

[6] At trial, the Defendants objected to the admission of the testimony of both Plaintiffs' experts regarding the identification of the subject bears' species on the grounds that these opinions were not timely disclosed.  The Court held the Defendants' objection in abeyance pending the Court's review of these expert reports.  Upon consideration of these reports, the Court concludes that the Defendants have suffered no undue prejudice as a result of the timing of the disclosure of these opinions.  Accordingly, the Court overrules the Defendants' objections to the admission of the testimony of both Ms. Poulsen and Dr. Ramsay regarding the identification of the species of the bears at issue.

he observed in videos taken of the subject bears. [T. 237; Plaintiffs' Ex. 60]. As Dr. Ramsay explained, grizzly bears "have a noticeable hump that Eurasian brown bears do not." [T. 232].

25. The Defendants presented no credible evidence that the subject bears are anything other than grizzly bears. Ms. Coggins testified that the brown bears were referred to as grizzly bears simply for promotional purposes, and that the references on the certificate of veterinary examination were a "mistake." [T. 492, 501]. In light of the Defendants' representations to the USDA, however, Ms. Coggins' testimony in this regard is not credible.

26. While the CBZ's primary veterinary care provider, David Ackerman, D.V.M., testified that the subject bears are European brown bears, Dr. Ackerman has no specialized knowledge or skill pertaining to the identification of sub-species of brown bears. Dr. Ackerman is not a specialist in zoology. He is a veterinarian, and ninety-five percent of his veterinary practice involves the treatment of small mammals. [T. 526, 535]. Dr. Ackerman has no credible basis for his opinion as to the identification of the sub-species of the subject bears, and therefore his opinion is nothing more than speculation. The credibility of Dr. Ackerman's opinion in this regard is further undermined by the fact

that he has, over the course of the years, signed USDA Veterinary Health Certificates accompanying the transport of cubs from the CBZ certifying that cubs born to the subject bears are grizzly bear cubs.

27. Based on the foregoing evidence, the Court finds as fact that the four bears at issue are of the species *ursus arctos horribilis*, more commonly referred to as "grizzly bears."

### D. CBZ's Animal Husbandry Practices

28. Barry and Collette Coggins began operating the CBZ in 1994. [T. 415]. They oversaw the construction of the Zoo, which exceeded the minimum requirements of the USDA at the time. [T. 416].

29. The Defendants' first brown bear was Elvis, whom they brought from another roadside zoo where they both had previously worked. Marge was purchased later. [T. 424]. Elvis and Marge are Lucky's parents. [T. 427]. Lucky and Layla were both born at the CBZ. [T. 437].

30. The CBZ holds a Class C Exhibitor's license issued by the USDA. The CBZ's license has never been suspended or revoked. [T. 418]. The CBZ is subjected to surprise inspections every three months by the USDA. [T. 196, 197, 419].

31. Over the years, the CBZ has received two or three notices of the need for corrective action with respect to the bears.[7] [T. 420]. The CBZ has never received a noncompliance notice, and the USDA has never brought an enforcement action against the Zoo. [T. 418-19, 420-21, 447, 517, 545, 546; Defendants' Exs. 11-30].

32. The Plaintiffs' expert, Ms. Poulsen, made four visits to the CBZ between October 2009 and November 2014 in order to observe the bears and review the records pertaining to their care and treatment. [Plaintiffs' Ex. 37 at 21].

33. Ms. Poulsen testified that the pit enclosures are not accepted by the international zoo community as appropriate housing for captive brown bears [Id. at 76].

34. Ms. Poulsen further testified that the pit enclosures do not meet minimum size standards required by North Carolina regulation 15A N.C. Admin. Code § 10H.0302(b)(5)[8] for black bears. [Id. at 41-43].

---

[7] In June 2010, the USDA issued the CBZ a repeat sanitation violation arising from chipped areas around the pool and the den entrance in Lucky and Layla's enclosure. Ms. Coggins testified that the chipped areas had been repaired after the first notice but had chipped again before the next inspection. [T. 521-23; Defendants' Ex. 12]. There is no evidence in the record that the CBZ received any further notices of violations regarding this issue.

[8] The State of North Carolina's minimum standards for the proper housing of captive American black bears require, among other things: (a) at least one acre for one or two

35. Ms. Poulsen opined that the pit enclosures at the CBZ do not meet generally accepted animal husbandry practices, because: the high walls and small size of the enclosures prevent wind from eddying into the pits, thereby depriving the bears of their sense of smell on a daily basis [Id. at 44-45]; there is music playing constantly which blocks out other sounds the bears might be interested in hearing [Id. at 47]; the high walls force the bears to sit in an abnormal position, with their heads leaning back, which results in physical stress if they wish to see anything moving [Id. at 48]; and no significant shade structures are present [Id. at 60-61].

36. Ms. Poulsen observed the bears pacing, which is stereotypic (i.e., abnormal) behavior. [Id. at 59].

37. According to Ms. Poulsen, public feeding is not a standard husbandry practice as it encourages the bears to beg for food, which is an abnormal behavior, and presents a risk of disease being transferred to the bears from members of the public. For these reasons, public

---

bears and an additional one-eighth acre for each additional bear; (b) that at least one-half of the area of confinement is wooded with living trees, shrubs and other perennial vegetation capable of providing shelter from sun and wind; and (c) that the area of confinement presents an overall appearance of a natural habitat and affords the bears protection from harassment or annoyance. 15A N.C. Admin. Code § 10H.0302(b)(5).

feeding is prohibited by the standards established by the Association of Zoos and Aquariums ("AZA"). [Id. at 53].

38. The Association of Zoos and Aquariums ("AZA") has developed standards as to how a zoo should operate with regard to the treatment and care of captive animals and all aspects of zoo operation. [T. 283-84; Plaintiffs' Ex. 84].[9] In some respects, AZA accreditation standards are more stringent than existing state and federal laws and regulations. [T. 285]. Less than 10% of the 2,800 exhibitors in the United States are accredited members of the AZA. [T. 331].

39. Dr. Poulsen testified to her opinion that the CBZ is not in compliance with the Animal Welfare Act ("AWA") because the pit enclosures do not allow for freedom of movement. [Plaintiffs' Ex. 37 at 224, 255]. Specifically, she testified:

> I believe these animals [would be] free to move, if they lived in, say, an environment similar to what the state of North Carolina sets out for American black bears. That's free to move. Because the animal is able to run, swim, walk, you know, climb, those kind of things. That's not possible in these pit enclosures.

[Id. at 255].

---

[9] The Defendants objected to the admission of the AZA standards on the basis of relevance and that objection was held in abeyance. The Defendants' objection is overruled.

40.   Ms. Poulsen conceded that the USDA has determined that the CBZ is

in compliance with the Animal Welfare Act, but she does not agree with

this assessment.  [Id. at 224]. On this point, Ms. Poulsen explained as

follows:

> Q.   And so that is just a disagreement that you
> have with the [USDA] inspectors and their opinions?
>
> A.   No, I would say that's a disagreement that the
> captive community as a whole has with the USDA
> and their interpretation of the law.  Which is why I
> believe . . . Congress is currently in the process of
> trying to set up bear specific regulations.  So it's not
> just me who disagrees with that, it's many other
> organizations, zoos, people who work with bears,
> and maybe Congress, I guess.
>
> *      *      *
>
> Q.   The [USDA] inspectors continue to approve of
> [the CBZ's] practices, but you would disagree,
> professionally, and say you have a different opinion,
> and if you were the inspector you would not allow
> that; is that correct?
>
> *      *      *
>
> A.   Correct.

[Id. at 259, 260-61].

41.   The Plaintiffs' second expert, Dr. Ramsay, visited the CBZ in

November 2014.  [T. 243].  Additionally, he reviewed photographs and

videos taken by other witnesses within the last five years.  [T. 244].

42.    Dr. Ramsay opined that the CBZ's enrichment program fails to meet generally accepted animal husbandry practices, as the Zoo fails to provide adequate enrichment for the bears.  [T. 306].

43.    Dr. Ramsay further opined that begging for food is not a normal behavioral pattern for a bear.  [T. 246].  Dr. Ramsay opined that this abnormal behavior is encouraged by the CBZ, because it allows public feeding of the bears.  [T. 247].  Dr. Ramsay termed this "an unfortunate practice" as it prevents the zoo from controlling the animals' nutrition, it poses a risk of foreign objects being swallowed by the bears and for the communication of diseases, and it encourages stereotypic behavior.  [T. 248-49].

44.    Dr. Ramsay further opined that the concrete pits do not meet generally accepted husbandry practices because: they are constructed of high block walls that are taller than a bear can reach [T. 251]; they are devoid of enrichment[10] [T. 254, 260-61]; and they lack adequate shade [T. 255].  He further opined that the size of the enclosures also fails to meet generally accepted animal husbandry practices, as the pits are

_____

[10] Dr. Ramsay explained that "enrichment" items are things that are used to stimulate normal behavior in animals, which for bears would be activities such as digging, climbing or foraging.  [T. 250, 257].

only a few hundred square feet in area, whereas a bear's natural habitat would be multiple square miles.  [T. 301].

45.  According to Dr. Ramsay, the AZA accreditation standards form the basis for generally accepted practices in the field of zoology.  [T. 283; Plaintiffs' Ex. 84].  According to Dr. Ramsay, it is the "generally held opinion in the captive animal community" that Section 10.3.3 of the AZA constitutes generally accepted husbandry practices.  [T. 334]. Section 10.3.3 provides, in pertinent part, as follows:

> All animal enclosures (exhibits, holding areas, hospital, and quarantine/isolation) must be of a size and complexity sufficient to provide for the animal's physical, social, and psychological well-being; and exhibit enclosures must include provisions for the behavioral enrichment of the animals . . . .

Association of Zoos and Aquariums, Accreditation Standards and Related Policies § 10.3.3 (2015 ed.).

46.  Dr. Ramsay opined that the CBZ pit enclosures fail to meet Section 10.3.3 of the AZA Standards.  [T. 304].

47.  Dr. Ramsay further opined that the North Carolina standards for captive black bear enclosures, 15A N.C. Admin. Code § 10H.0302(b)(5), provides "a reasonable expectation" for the generally

accepted husbandry practices required for the CBZ, and that the pit enclosures also fail to meet this standard. [T. 291-93].

48. Dr. Ramsay testified that the CBZ's feeding practices fail to meet generally accepted husbandry practices, as public feeding of animals is generally not accepted. [T. 305].

49. Dr. Ramsay further opined that the minimum standards established by the Animal Welfare Act ("AWA") do not constitute "generally accepted animal husbandry practices," [T. 312], but rather "they are actually the absolute minimum standard." [Id.].

50. Further, Dr. Ramsay opined that the CBZ's practices fall short of the AWA minimum standards because the CBZ fails to provide the bears with adequate methods to escape excessive heat and to move away from the public. [T. 313-14].

51. With respect to veterinary care, Dr. Ramsay testified that it was unclear from the records whether the bears have ever been immobilized for examination. Further, the records indicate that the bears were treated on multiple occasions for skin problems or hair loss, but the only diagnostic test indicated was a single fungal culture. [T. 315].

52. Based on what he observed, Dr. Ramsay opined that the USDA should take enforcement action against the CBZ for violations of the AWA. [T. 335-36].

53. According to both Ms. Coggins and Dr. Ackerman, the bears are in good health. Dr. Ackerman visits the bears on a monthly basis. [T. 440, 531]. He testified that the bears' weight is normal and their fecal matter has been normal. [T. 560]. While the bears occasionally have exhibited some hair loss, Dr. Ackerman did not believe that this hair loss was due to stress, as it appeared to be a seasonal allergic reation which responded to medical treatment. [T. 441, 559, 583].

54. According to both Ms. Coggins and Dr. Ackerman, the bears do not exhibit stereotypic behavior. [T. 443, 555].

55. Ms. Coggins testified that the bears receive limited feeding from the public of apples, bread, lettuce, and pellets of dog food; the Zoo ensures that the bears are also fed meat, vegetables, fruits, nuts, and berries on a daily basis. [T. 444]. Underneath the public walkway and adjoining the pit enclosures, there are additional enclosures lined with hay or wood shavings where the bears can access food and water and come and go as they please. [T. 445].

56. Dr. Ackerman admits that current zookeeping practices for brown bears provide for more space and a more natural environment, and he has had discussions with Mr. Coggins of implementing such practices in the future.  [T. 573].

## CONCLUSIONS OF LAW

### A.    Do the Plaintiffs have standing?

1.    This Court has subject matter jurisdiction over this matter pursuant to Section 11(g) of the Endangered Species Act, 16 U.S.C. § 1540(g) ("ESA"), and 28 U.S.C. § 1331.

2.    Article III of the United States Constitution limits federal courts' jurisdiction to actual "cases" or "controversies."  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180 (2000).  As the Supreme Court has explained, "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).

3.    The party invoking federal jurisdiction has the burden of establishing standing.  Id. at 561.

4.    The doctrine of standing is intended "to ensure that the plaintiff has a sufficient personal stake in the outcome of a dispute to render judicial

resolution of it appropriate . . . ." <u>Friends for Ferrell Parkway, LLC v. Stasko</u>, 282 F.3d 315, 319 (4th Cir. 2002).  In order to satisfy Article III's standing requirement, a plaintiff must demonstrate that: (1) plaintiff suffered an injury in fact (2) that the injury suffered is "fairly traceable" to the challenged actions of the defendant; and (3) that it is likely, rather than just speculative, that the plaintiff's alleged injury will be redressed by a favorable decision by the Court.  <u>Defenders of Wildlife</u>, 504 U.S. at 560-61.

5.    To establish injury in fact, a plaintiff must demonstrate that she has "suffer[ed] an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent."  <u>Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.</u>, 204 F.3d 149, 154 (4th Cir. 2000).  For the purposes of Article III standing, injury in fact means injury to the plaintiff, not injury to the environment or the endangered species at issue.  <u>Laidlaw</u>, 528 U.S. at 181.

6.    To satisfy the causation requirement of standing, a plaintiff must establish "a causal connection between the injury and the conduct complained of – the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of

some third party not before the court." <u>Bennett v. Spear</u>, 520 U.S. 154, 167 (1997) (citing <u>Defenders of Wildlife</u>, 504 U.S. at 560-61).

7.  In order to satisfy the redressability requirement, a plaintiff must establish that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." <u>Id.</u>

8.  With respect to Counts One and Two of the Amended Complaint, the Plaintiffs have met their burden of establishing standing to challenge the CBZ's past and ongoing practice of keeping four adult grizzly bears in concrete pit enclosures and allowing public feeding.

9.  Specifically, the Plaintiffs have demonstrated a cognizable injury in that they previously visited the subject bears at the Zoo and suffered aesthetic and emotional harm from observing the bears living in virtually barren concrete pits and being subjected to public feeding. The Plaintiffs have established that they have a spiritual and cultural connection with the bears and developed a strong personal and emotional attachment to them. They also have established that they have an aesthetic interest in seeing the bears living in humane conditions.

10. The Supreme Court has made clear that injury to an aesthetic interest in the observation of animals in a humane setting is sufficient to satisfy

the injury-in-fact requirement of Article III standing. <u>Defenders of Wildlife</u>, 504 U.S. at 562-63 ("the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing"). "The key requirement . . . is that the plaintiff suffered his injury in a personal and individual way – for instance, by seeing with his own eyes the particular animal whose condition caused him aesthetic injury." <u>Animal Legal Def. Fund, Inc. v. Glickman</u>, 154 F.3d 426, 433 (D.C. Cir. 1998). The claimed injury need not be great or substantial; an "identifiable trifle, if actual and genuine, gives rise to standing." <u>United States v. Students Challenging Regulatory Agency Procedures (SCRAP)</u>, 412 U.S. 669, 689 n. 14 (1973).

11. The Plaintiffs further have established that they want to visit the bears again but are unable do so while the bears are kept at the Zoo in their current condition because of the additional injury the Plaintiffs would suffer from witnessing the bears in these conditions. Such conditional statements that the Plaintiffs would return to visit the bears but for the complained-of conditions are sufficient to establish an injury in fact. <u>See</u> <u>Lindlaw</u>, 528 U.S. at 184 (holding that plaintiffs had standing to

sue where they offered conditional statements that they would use the nearby river if not for the discharge of pollutants in the river).

12. The Plaintiffs also have satisfied the causation and redressability requirements regarding their claims challenging the conditions of the bears' confinement. The Plaintiffs have established that the Defendants are causing the Plaintiffs' aesthetic injuries by their treatment of the subject bears. See, e.g., Libertarian Party v. Judd, 718 F.3d 308, 315-16 (4th Cir.) (causation established if challenged actions are at all responsible for plaintiffs' injuries), cert. denied, 134 S.Ct. 681 (2013). The Plaintiffs have also demonstrated that their aesthetic injuries would likely be redressed if they achieve the relief they have demanded, in that they would be able to visit the bears in a more humane setting. See, e.g., Animal Legal Def. Fund, 154 F.3d at 443 (finding standing where plaintiffs established that more stringent regulations would result in more humane conditions which would necessarily alleviate plaintiffs' aesthetic injury in the future); see also Bennett, 520 U.S. at 167 (plaintiff need only show that it is "likely" that an injury will be redressed).

13. To the extent that the Plaintiffs challenge the housing of grizzly bear cubs or breeding procedures employed by the CBZ as an unlawful

taking in violation of the ESA in Counts One and Two of the Amended Complaint, the Plaintiffs have failed to demonstrate standing to assert such claims. There is no evidence in the record to suggest that the Plaintiffs saw any grizzly bears cubs at the CBZ, or that they were aware of the CBZ's breeding practices. As such, the Plaintiffs have not demonstrated that their claimed aesthetic injury is fairly traceable to the manner in which the Defendants treat grizzly bear cubs or breed the subject bears.

14. Similarly, the Plaintiffs have failed to demonstrate standing for Count Three of the Amended Complaint. The Plaintiffs have failed to present any evidence that their claimed aesthetic injury is fairly traceable to the Defendants' acquisition or disposal of grizzly bear cubs in interstate or foreign commerce.

15. Accordingly, Counts One and Two of the Amended Complaint – to the extent that such claims challenge the Defendants' treating of grizzly bear cubs or breeding practices – as well as Count Three of the Amended Complaint, are dismissed for lack of standing.

**B.    Was there a "taking" or unlawful possession of a "taken" grizzly bear within the meaning of the ESA?**

16.    The ESA defines an "endangered species" as "any species which is in danger of extinction."  16 U.S.C. § 1532(6).  A "threatened species" is any species that is likely to become endangered within the foreseeable future.  16 U.S.C. § 1532(20).

17.    For purposes of the ESA, a "grizzly bear" is "any member of the species *Ursus arctos horribilis* of the 48 conterminous States of the United States …." 50 C.F.R. § 17.40(b)(2).

18.    Grizzly bears in the lower 48 States are listed by the United States Fish and Wildlife Service ("FWS") as a threatened species. 50 C.F.R. § 17.11(h) (see listing in table).

19.    Because the Plaintiffs have proved by a preponderance of the evidence that the four subject bears are grizzly bears, the provisions of the ESA and the regulations promulgated thereunder apply to these bears.

20.    Section 9(a)(1)(B) of the ESA, 16 U.S.C. § 1538(a)(1)(B), prohibits the "taking" of any endangered or threatened species.

21. Section 9(a)(1)(D) of the ESA, 16 U.S.C. § 1538(a)(1)(D), makes it unlawful to possess any endangered or threatened species that has been unlawfully "taken" in violation of Section 9(a)(1)(B).

22. For a threatened species, like the grizzly bear, the ESA provides that the FWS or the National Marine Fisheries Service shall promulgate regulations that they deem "necessary and advisable to provide for the conservation of such species," including applying some or all of the Section 9 prohibitions to the threatened species. 16 U.S.C. § 1533(d).

23. FWS regulations specifically prohibit the "taking" of any grizzly bear in the 48 conterminous states of the United States, including North Carolina. 50 C.F.R. § 17.40(b)(1)(i)(A).

24. FWS regulations further provide that "no person shall possess . . . any unlawfully taken grizzly bear." 50 C.F.R. § 17.40(b)(1)(ii)(A).

25. The prohibitions in Section 9(a)(1) of the ESA and its accompanying regulations apply to endangered or threatened animals bred and/or kept in captivity, as well as those in the wild. See, e.g., Safari Club Int'l v. Jewell, 960 F. Supp. 2d 17, 30 (D.D.C. 2013); see also Final Rule, Listing Endangered or Threatened Species: Amendment to the Endangered Species Act Listing of the Southern Resident Killer Whale Distinct Population Segment, 80 Fed. Reg. 7380-01, 7385 (Feb. 10,

2015) ("[T]he ESA does not allow for captive held animals to be assigned separate legal status from their wild counterparts on the basis of their captive status . . . . [C]aptive members of a species have the same legal status as the species as a whole. . . . [C]aptive members of a listed species are also subject to the relevant provisions of section 9 of the ESA as warranted").

26. The ESA defines the term "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). In <u>Babbitt v. Sweet Home Chapter of Communities for a Great Oregon</u>, the Supreme Court held:

> Congress intended "take" to apply broadly . . . . The Senate Report stressed that "[t]ake is defined . . . in the broadest possible manner to include every conceivable way in which a person can take or attempt to take any fish or wildlife." The House Report stated that "the broadest possible terms" were used to define restrictions on takings.

515 U.S. 687, 704-05 (1995) (internal citations and quotations marks omitted). Here, the Plaintiffs allege that the Defendants' conduct "harm" and "harasses" the subject bears and thus results in a taking.

27. "Harm," as used in the definition of "take," is defined as "an act which *actually kills or injures wildlife*. Such act may include significant habitat

modification or degradation where it *actually kills or injures wildlife* by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3 (emphasis added).

28. A mere potential for future injury is insufficient to establish a "harm." Rather, there must be a showing that an *actual injury* has occurred or is reasonably certain to occur in the imminent future. <u>See</u> <u>Sweet Home</u>, 515 U.S. at 702-03; <u>Marbled Murrelet v. Pacific Lumber Co.</u>, 83 F.3d 1060, 1068 (9th Cir. 1996); <u>American Bald Eagle v. Bhatti</u>, 9 F.3d 163, 166 (1st Cir. 1993); <u>Animal Welfare Inst. v. Beech Ridge Energy LLC</u>, 675 F. Supp. 2d 540, 562 (D. Md. 2009); <u>Strahan v. Holmes</u>, 595 F. Supp. 2d 161, 164 (D. Mass 2009).

29. The Plaintiffs have failed to demonstrate by a preponderance of the evidence that the Defendants' treatment of the four grizzly bears at the CBZ constitutes "harm" as that term is defined in the ESA and applicable regulations. Specifically, the Plaintiffs have failed to demonstrate that the Defendants' animal husbandry practices resulted in any death or actual injury to the subject bears or that such death or injury is reasonably certain to occur in the imminent future.

30. While the Plaintiffs' experts expressed concern that the public feeding of the bears could allow for foreign objects to be swallowed by the

bears or for the communication of diseases, no such injuries have in fact occurred. That such harm may *potentially* occur if the practice is continued is not sufficient to establish a "harm" within the meaning of the regulation. See <u>Sweet Home</u>, 515 U.S. at 702-03; <u>Marbled Murrelet</u>, 83 F.3d at 1068; <u>American Bald Eagle</u>, 9 F.3d at 166; <u>Animal Welfare Inst.</u>, 675 F. Supp. 2d at 562; <u>Strahan</u>, 595 F. Supp. 2d at 164.

31. Further, the Plaintiffs' experts opined that the bears suffered hair loss as a result of the stress created by the conditions of the pit enclosures. The Defendants' veterinarian opined, however, that such hair loss was in fact seasonal and was regularly treated effectively with medication.

32. While the Plaintiffs' expert testified that the conditions of the bears' confinement caused abnormal behavioral patterns in the bears, such as pacing, the Plaintiffs have failed to provide any evidence that such behavior would not otherwise exist with captive brown bears.

33. "Harass," as used in the definition of "take," is defined as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3.

34. The definition of "harass" in the ESA regulations includes certain

exceptions for captive wildlife:

> This definition, when applied to captive wildlife, does
> not include generally accepted:
>
> (1) Animal husbandry practices that meet or exceed
> the minimum standards for facilities and care under
> the Animal Welfare Act,
>
> (2) Breeding procedures, or
>
> (3) Provisions of veterinary care for confining,
> tranquilizing, or anesthetizing, when such practices,
> procedures, or provisions are not likely to result in
> injury to the wildlife.

> Id.

35. The Plaintiffs have failed to prove by a preponderance of the evidence

that the Defendants' treatment of the four grizzly bears at the CBZ

constitutes "harassment" as that term is defined in the ESA and the

relevant regulations.

36. The Plaintiffs contend that the exception regarding animal husbandry

practices in 50 C.F.R. § 17.3 pertains only to "generally accepted"

animal husbandry practices and thus any of the Defendants' practices

that are not so "generally accepted" would constitute "harassment." To

that end, the Plaintiffs presented evidence, primarily through the

testimony of Ms. Poulsen and Dr. Ramsay, that the CBZ's animal

husbandry practices are not "generally accepted" within the zoological community, and particularly fail to comply with the accreditation standards of the AZA and the North Carolina regulations for captive black bears.

37.     The Court concludes that the Plaintiffs' interpretation of 50 C.F.R. § 17.3 in this regard is incorrect and unsupported by the language of the regulation.   Whether the CBZ's practices are generally accepted by other zookeepers or meet certain standards established by state law or voluntary accrediting associations such as the AZA is not relevant. According to the plain language of 50 C.F.R. § 17.3, an exhibitor's husbandry practices which complies with the *minimum standards* for facilities and care under the AWA falls outside of the definition of "harassment" as set forth in the ESA.   Only when the exhibitor's practices fail to meet the minimum standards established by the Animal Welfare Act can such practices constitute "harassment" of a captive endangered or threatened species.

38.     Alternatively, the Plaintiffs contend that the CBZ's animal husbandry practices do not meet the minimum standards under the AWA. Specifically, the Plaintiffs cite to one particular regulation promulgated

by the United States Department of Agriculture under the AWA with regard to space requirements.[11]  That regulation provides as follows:

> Enclosures shall be constructed and maintained so as to provide sufficient space to allow each animal to make normal postural and social adjustments with adequate freedom of movement.  Inadequate space may be indicated by evidence of malnutrition, poor condition, debility, stress, or abnormal behavior patterns.

9 C.F.R. § 3.128.

39.  The Plaintiffs have failed to prove by a preponderance of the evidence that the pit enclosures fail to comply with 9 C.F.R. § 3.128.  The pit enclosures are large enough to allow each of the subject bears to make normal postural and social adjustments with adequate freedom of movement.  There is no evidence that any of the bears are malnourished, in poor condition, or physically weak.  Furthermore, there is no evidence that the bears have exhibited signs of stress or abnormal behavior patterns as a result of the size of their enclosures.  In fact, there is no evidence that the bears have exhibited signs of

---

[11] The Animal Welfare Act regulations do not contain any specific husbandry practices for grizzly bears or bears in general.  Bears are covered by the provisions applicable to elephants, large cats, and other non-primates.

stress or abnormal behavior patterns beyond what any grizzly bear would exhibit as a result of being held in captivity.

40. The USDA has concluded that the pit enclosures do not violate the provisions of § 3.128 when it has conducted quarterly inspections of the CBZ's facilities, in that it has never cited the CBZ for providing inadequate space for the grizzly bears.  In fact, the USDA has never cited the CBZ for any violation of the AWA.  While corrective action has been requested on occasion, the CBZ has promptly responded to the USDA's requests.  As a result, the CBZ has continually maintained its Class C exhibitor license.

41. For the foregoing reasons, the Court concludes that the subject bears were not "taken" within the meaning of the ESA.

## CONCLUSION

It appears to be the general consensus of nearly all involved that the pit enclosures at issue are not ideal.  While such enclosures may have been the standard practice twenty years ago, they are now generally considered archaic.  Modern zookeeping standards, as well as the expectations of the general public, have evolved to require more natural environments for captive wildlife.   Such environments not only benefit the animals by enhancing their overall well-being; they also benefit the members of the

public who wish to observe such animals by providing the public a more enriching experience.  The issue before the Court, however, is not whether the bears could be in a better environment.  Undoubtedly they could.  Rather, the issue before the Court is whether the pit enclosures, archaic as they may be, are so harmful and harassing as to amount to a "taking" under the Endangered Species Act.  For the reasons set forth above, the Court concludes that they are not.

Based on the foregoing, the Court finds as fact, by a preponderance of the evidence, that the subject bears are grizzly bears, a threatened species subject to the protection of the Endangered Species Act.  The Court concludes as a matter of law that the Plaintiffs have standing to challenge the conditions under which the bears are kept at the Cherokee Bear Zoo. The Plaintiffs do not have standing, however, to challenge the Zoo's treatment of grizzly bear cubs, the Zoo's breeding procedures or their acquisition or disposal of grizzly bear cubs in interstate or foreign commerce. The Court further concludes that the Plaintiffs have failed to prove by a preponderance of the evidence that these bears were "taken" within the meaning of the Endangered Species Act.  There being no "taking," the Plaintiffs have failed to prove a violation of the ESA with regard to the

Defendants' captivity of the four bears in question. Therefore, the Plaintiffs' claims will be dismissed.

## O R D E R

**IT IS, THEREFORE, ORDERED** that this action is hereby **DISMISSED WITH PREJUDICE** in its entirety, and the Defendants shall recover their costs of the action from the Plaintiffs.

A Judgment consistent with this Memorandum of Decision and Order shall be filed contemporaneously herewith.

**IT IS SO ORDERED.**

Signed: March 30, 2016

Martin Reidinger
United States District Judge