**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CIVIL CASE NO. 2:13-cv-00047-MR-DLH**

| | | |
|---|---|---|
| **PEGGY HILL and AMY WALKER,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF** |
| | ) | **DECISION AND ORDER** |
| | ) | |
| **BARRY COGGINS and COLLETTE** | ) | |
| **COGGINS, d/b/a CHEROKEE BEAR** | ) | |
| **ZOO, and COGGINS & COGGINS,** | ) | |
| **INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on remand from the Fourth Circuit

Court of Appeals, Hill v. Coggins, 867 F.3d 499 (4th Cir. 2017), cert. denied,

138 S. Ct. 1003 (2018), and the parties' supplemental briefs [Docs. 112, 113,

115, 116]. Upon consideration of the Fourth Circuit's opinion, the testimony

and evidence presented by the parties at trial, and the arguments of counsel,

the Court hereby enters the following Memorandum of Decision and Order.

## I.    PROCEDURAL BACKGROUND

The Plaintiffs Peggy Hill and Amy Walker initiated this citizen suit on

December 3, 2013, against the Defendants Barry Coggins and Collette

Coggins, collectively doing business as Cherokee Bear Zoo ("CBZ" or "Zoo"),

alleging various violations of the Endangered Species Act, 16 U.S.C. §§ 1531-1544 ("ESA").[1]  [Doc. 1].  As asserted in their Amended Complaint, the Plaintiffs allege that the Zoo's past and ongoing practice of keeping four adult grizzly bears in allegedly undersized concrete pits constitutes an unlawful "taking" and unlawful possession of a "taken" threatened species (Counts One and Two).[2]  [Doc. 30].

After the Defendants' motion for summary judgment was denied [Text-Only Order entered Aug. 13, 2015], the case proceeded to a bench trial.  On March 30, 2016, the Court entered an Order containing findings of fact and conclusions of law.  [Doc. 93].  Specifically, the Court concluded that the Plaintiffs generally had standing to bring their suit.[3]  The Court further found

---

[1] The Plaintiffs also brought suit against Coggins & Coggins, Inc.  The evidence presented at trial indicated that Coggins & Coggins, Inc. was administratively dissolved in 2010, and that it did not own or operate the Zoo during any time period relevant to this case. [Plaintiffs' Ex. 27 at 20].  Accordingly, the Plaintiffs' claims against Defendant Coggins & Coggins, Inc. were dismissed, and that ruling was not disturbed on appeal.  All references to "Defendants" in this Memorandum of Decision and Order shall apply to Barry Coggins and Collette Coggins only.

[2] The Plaintiffs also alleged in Count Three that the Zoo's practice of acquiring and/or disposing of grizzly bear cubs in interstate or foreign commerce in the course of a commercial activity violates the ESA.  [Doc. 30].  Following the bench trial, that claim was dismissed due to the Plaintiffs' lack of standing.  [Doc. 93].  That ruling was not disturbed on appeal.

[3] As noted above, the Court concluded that the Plaintiffs did not have standing to challenge the Defendants' treatment of bear cubs or the breeding procedures employed by the Zoo.

2

that the four subject bears were in fact grizzly bears and thus subject to protection under the ESA.  However, the Court concluded that the manner in which the Zoo maintains the bears does not amount to an unlawful taking under the Act.  Accordingly, the Court dismissed the Plaintiffs' action in all respects.  [Doc. 93].

Both the Plaintiffs and the Defendants appealed.  On August 14, 2017, the Fourth Circuit Court of Appeals affirmed the Court's rulings on the issues of standing and the status of the subject bears as grizzly bears.  Hill, 867 F.3d at 502.  The Fourth Circuit concluded, however, that this Court erred in its legal analysis of the issue of whether the Zoo is committing an unlawful taking of the bears.  Id.  Accordingly, that ruling was vacated, and this matter was remanded for further proceedings.  Id.  The United States Supreme Court denied a petition for a writ of certiorari on February 20, 2018.  Hill v. Coggins, 138 S. Ct. 1003 (2018).

Following the denial of the writ of certiorari, this Court ordered the parties to file supplemental briefing on the issues raised by the Fourth Circuit's opinion.  The parties filed their respective briefs [Docs. 112, 113], and responded to each other's brief in kind [Docs. 115, 116].

Having been fully briefed, this matter is ripe for disposition.

## II.    FACTUAL BACKGROUND

The following is a summary of the relevant findings of fact made by the Court upon conclusion of the bench trial.   These factual findings were not disturbed on appeal.

The Plaintiffs Peggy Hill and Amy Walker are enrolled members of the Eastern Band of Cherokee Indians ("EBCI").  [T. 18, 100].  Both Plaintiffs reside within the Qualla Boundary in Cherokee, North Carolina.  [T. 16, 98]. Defendants Barry Coggins and Collette Coggins have owned and operated the Cherokee Bear Zoo, an unaccredited roadside zoo in Cherokee, North Carolina, for over twenty years.  [T. 411, 415].  There are approximately 35 animals currently at the Zoo, including black bears, monkeys, lemurs, goats, and a tiger.  [T. 67, 203].  The Zoo also possesses four grizzly bears that are the subject of this litigation: Elvis, Marge, Lucky, and Layla.  [T. 424-27]. The grizzly bears are housed in concrete pits and can be viewed by the general public from a walkway above.   Underneath the public walkway and adjoining the pit enclosures, there are additional enclosures lined with hay or wood shavings where the bears can access food and water, come out of the sun, and come and go as they please.  [T. 445].

Barry and Collette Coggins began operating the Zoo in 1994. [T. 415]. They oversaw the construction of the Zoo, which exceeded the minimum requirements of the United States Department of Agriculture (USDA)[4] at the time. [T. 416]. The Defendants' first grizzly bear was Elvis, whom they brought from another roadside zoo where they both had previously worked. Marge was purchased later. [T. 424]. Elvis and Marge are Lucky's parents. [T. 427]. Lucky and Layla were both born at the Zoo. [T. 437].

The Zoo holds a Class C Exhibitor's license issued by the USDA. The Zoo's license has never been suspended or revoked. [T. 418]. The Zoo is subjected to surprise inspections every three months by the USDA. [T. 196, 197, 419]. Over the years, the Zoo has received two or three notices of the need for corrective action with respect to the bears.[5] [T. 420]. The Zoo has never received a noncompliance notice, and the USDA has never brought

---

[4] The USDA is authorized to promulgate rules and regulations pursuant to the Animal Welfare Act. See 7 U.S.C. § 2151; see also § 2143(a)(1)-(2). An animal exhibitor must obtain a license from the USDA. See 7 U.S.C. § 2134. The USDA has discretion to investigate or inspect a licensee's facilities as it "deems necessary" for violations of the AWA or USDA regulations. 7 U.S.C. § 2146(a).

[5] In June 2010, the USDA issued the Zoo a repeat sanitation violation arising from chipped areas around the pool and the den entrance in Lucky and Layla's enclosure. Ms. Coggins testified that the chipped areas had been repaired after the first notice but had chipped again before the next inspection. [T. 521-23; Defendants' Ex. 12]. There is no evidence in the record that the Zoo received any further notices of violations regarding this issue.

an enforcement action against the Zoo.  [T. 418-19, 420-21, 447, 517, 545, 546; Defendants' Exs. 11-30].

The Plaintiffs' expert, professional zookeeper Else Poulsen, made four visits to the Zoo between October 2009 and November 2014 in order to observe the bears and review the records pertaining to their care and treatment.  [Plaintiffs' Ex. 37 at 21].  Ms. Poulsen testified that pit enclosures are not accepted by the international zoo community as appropriate housing for captive brown bears.  [Id. at 76].  Ms. Poulsen further testified that the pit enclosures do not meet minimum size standards required by North Carolina regulation 15A N.C. Admin. Code § 10H.0302(b)(5)[6] for the housing of captive black bears.  [Id. at 41-43].  Ms. Poulsen opined that the pit enclosures at the Zoo do not meet generally accepted animal husbandry practices because: the high walls and small size of the enclosures prevent wind from eddying into the pits, thereby depriving the bears of their sense of smell on a daily basis [Id. at 44-45]; there is music playing constantly which blocks out other sounds the bears might be interested in hearing [Id. at 47];

---

[6] The State of North Carolina's minimum standards for the proper housing of captive American black bears require, among other things: (a) at least one acre for one or two bears and an additional one-eighth acre for each additional bear; (b) that at least one-half of the area of confinement is wooded with living trees, shrubs and other perennial vegetation capable of providing shelter from sun and wind; and (c) that the area of confinement presents an overall appearance of a natural habitat and affords the bears protection from harassment or annoyance.  15A N.C. Admin. Code § 10H.0302(b)(5).

the high walls force the bears to sit in an abnormal position, with their heads leaning back, which results in physical stress if they wish to see anything moving [Id. at 48]; and no significant shade structures are present [Id. at 60-61].

Ms. Poulsen testified that she observed the bears pacing, which is stereotypic (i.e., abnormal) behavior. [Id. at 59]. According to Ms. Poulsen, public feeding is not a standard husbandry practice as it encourages the bears to beg for food, which is an abnormal behavior, and presents a risk of disease being transferred to the bears from members of the public. She noted that, for these reasons, public feeding is prohibited by the Accreditation Standards established by the Association of Zoos and Aquariums ("AZA"). [Id. at 53]. The AZA is a voluntary zoological organization that has developed accreditation standards as to how a zoo should operate with regard to the treatment and care of captive animals and all aspects of zoo operation. [T. 283-84; Plaintiffs' Ex. 84]. In some respects, AZA Accreditation Standards are more stringent than existing state and federal laws and regulations. [T. 285]. Less than 10% of the 2,800 exhibitors in the United States are accredited members of the AZA. [T. 331].

Ms. Poulsen testified that, in her opinion, the Zoo is not in compliance with the Animal Welfare Act ("AWA") because the pit enclosures do not allow

7

for freedom of movement.  [Plaintiffs' Ex. 37 at 224, 255].  Specifically, she testified:

> I believe these animals [would be] free to move, if they lived in, say, an environment similar to what the state of North Carolina sets out for American black bears.  That's free to move.  Because the animal is able to run, swim, walk, you know, climb, those kind of things.  That's not possible in these pit enclosures.

[Id. at 255].  Ms. Poulsen conceded that the USDA has determined that the Zoo is in compliance with the Animal Welfare Act, but she does not agree with this assessment.  [Id. at 224, 259, 260-61].

The Plaintiffs' second expert, Edward Ramsay, D.V.M., visited the Zoo in November 2014.  [T. 243].  Additionally, he reviewed photographs and videos taken by other witnesses within the last five years.  [T. 244].  Dr. Ramsay opined that begging for food is not a normal behavioral pattern for a bear.  [T. 246].  Dr. Ramsay opined that this abnormal behavior is encouraged by the Zoo because it allows public feeding of the bears.  [T. 247].  Dr. Ramsay described this as "an unfortunate practice" as it prevents the zoo from controlling the animals' nutrition; it poses a risk of foreign objects being swallowed by the bears and for the communication of diseases; and it encourages stereotypic behavior.  [T. 248-49].  Dr. Ramsay testified that the Zoo's feeding practices fail to meet generally accepted

8

husbandry practices, as public feeding of animals is not considered a generally accepted practice. [T. 305].

Dr. Ramsay further opined that the concrete pits do not meet generally accepted husbandry practices because: they are constructed of high block walls that are taller than a bear can reach [T. 251]; they are devoid of enrichment[7] [T. 254, 260-61]; and they lack adequate shade [T. 255]. He further opined that the size of the enclosures also fails to meet generally accepted animal husbandry practices, as the pits are only a few hundred square feet in area, whereas a bear's natural habitat would be multiple square miles. [T. 301].

According to Dr. Ramsay, the AZA Accreditation Standards form the basis for generally accepted practices in the field of zoology. [T. 283; Plaintiffs' Ex. 84]. According to Dr. Ramsay, it is the "generally held opinion in the captive animal community" that Section 10.3.3 of the AZA Accreditation Standards[8] constitutes generally accepted husbandry

---

[7] Dr. Ramsay explained that "enrichment" items are things that are used to stimulate normal behavior in animals, which for bears would be activities such as digging, climbing or foraging. [T. 250, 257].

[8] Section 10.3.3 provides, in pertinent part, as follows:

> All animal enclosures (exhibits, holding areas, hospital, and quarantine/isolation) must be of a size and complexity sufficient to provide for the animal's physical, social, and

9

practices and that the Zoo's pit enclosures fail to meet this standard. [T. 304, 334]. Dr. Ramsay could not identify, however, any literature or peer-reviewed article to support that proposition. [T. 334].

Dr. Ramsay opined that the "generally accepted" standard for an enclosure for two brown bears would be a minimum of fifty yards by fifty yards. [T. 386]. He did not cite any reference materials for this opinion, noting that the calculation of the minimum size required was "just a Dr. Ramsay opinion." [Id.].

Dr. Ramsay opined that the Zoo's pit enclosures also fail to meet the North Carolina regulatory standards for captive black bear enclosures, 15A N.C. Admin. Code § 10H.0302(b)(5). [T. 291-93]. These regulations require an enclosure to provide at least one acre of land for two black bears, plus additional acreage for every additional bear. Dr. Ramsay testified that these regulatory standards actually *exceed* what he considered to be the "generally accepted" practice. [Id.]. Nevertheless, he testified that the North Carolina regulatory standards would be a "reasonable expectation" for the

_____

> psychological well-being; and exhibit enclosures must include provisions for the behavioral enrichment of the animals . . . .

Association of Zoos and Aquariums, Accreditation Standards and Related Policies § 10.3.3 (2015 ed.) [Pls. Ex. 84].

type of enclosure that the Defendants should be providing for the subject grizzly bears. [T. 292-93; see also T. 319 (describing the North Carolina regulation as an "excellent" standard)].

With respect to veterinary care, Dr. Ramsay testified that it was unclear from the records whether the bears have ever been immobilized for examination. Further, the records indicate that the bears were treated on multiple occasions for skin problems or hair loss, but the only diagnostic test indicated was a single fungal culture. [T. 315]. Based on what he observed, Dr. Ramsay opined that the USDA should take enforcement action against the Zoo for violations of the AWA. [T. 335-36].

According to both Ms. Coggins and the Zoo's veterinarian, Dr. David Ackerman, the bears are in good health. Dr. Ackerman visits the bears on a monthly basis. [T. 440, 531]. He testified that the bears' weight is normal, and their fecal matter has been normal. [T. 560]. While the bears occasionally have exhibited some hair loss, Dr. Ackerman did not believe that this hair loss was due to stress, as it appeared to be a seasonal allergic reaction which responded to medical treatment. [T. 441, 559, 583].

According to both Ms. Coggins and Dr. Ackerman, the bears do not exhibit stereotypic behavior. [T. 443, 555]. Ms. Coggins testified that the bears receive limited feeding from the public of apples, bread, lettuce, and

11

pellets of dog food; the Zoo ensures that the bears are also fed meat, vegetables, fruits, nuts, and berries on a daily basis. [T. 444]. Dr. Ackerman admits that current zookeeping practices for brown bears provide for more space and a more natural environment, and he has had discussions with Mr. Coggins of implementing such practices in the future. [T. 573].

## III. DISCUSSION

The Plaintiffs assert that the Defendants' treatment of the subject grizzly bears violates Section 9 of the ESA, 16 U.S.C. § 1538. Specifically, the Plaintiffs claim that the Defendants have violated 16 U.S.C. § 1538(a)(1)(B), which prohibits the "take" of any endangered or threatened species, and 16 U.S.C. § 1538(a)(1)(D), which makes it unlawful to possess any endangered or threatened species that has been unlawfully "taken" in violation of § 1538(a)(1)(B). Regulations promulgated by the Fish and Wildlife Service (FWS) pursuant to the ESA specifically prohibit the "taking" of any grizzly bear in the lower 48 states, including North Carolina. 50 C.F.R. § 17.40(b)(1)(i)(A).[9] FWS regulations further provide that "no person shall possess . . . any unlawfully taken grizzly bear." 50 C.F.R. § 17.40(b)(1)(ii)(A).

---

[9] The ESA directs the FWS (or the National Marine Fisheries Service in the case of marine wildlife) to promulgate regulations that they deem "necessary and advisable to provide for the conservation of such species," including applying some or all of the Section 9 prohibitions to the threatened or endangered species. 16 U.S.C. § 1533(d).

The prohibitions in Section 9 of the ESA and its accompanying regulations apply to endangered or threatened animals bred and/or kept in captivity, as well as those in the wild. See, e.g., Safari Club Int'l v. Jewell, 960 F. Supp. 2d 17, 30 (D.D.C. 2013); see also Final Rule, Listing Endangered or Threatened Species: Amendment to the Endangered Species Act Listing of the Southern Resident Killer Whale Distinct Population Segment, 80 Fed. Reg. 7380-01, 7385 (Feb. 10, 2015) ("[T]he ESA does not allow for captive held animals to be assigned separate legal status from their wild counterparts on the basis of their captive status . . . . [C]aptive members of a species have the same legal status as the species as a whole. . . . [C]aptive members of a listed species are also subject to the relevant provisions of section 9 of the ESA as warranted").  In some instances, however, the regulations apply differently to captive animals.  At issue herein is the application of one of those exemptions that apply only to captive animals.

The ESA defines the term "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  As the Supreme Court has noted, the term "take" is defined "in the broadest possible manner to include every conceivable way in which a person can take or attempt to take any fish or

13

wildlife." Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 704 (1995) (internal citations and quotations marks omitted). Here, the Plaintiffs have alleged that the Defendants' conduct both "harms" and "harasses" the subject bears and thus results in a "taking."

## A. "Harassment"

"Harass," as used in the definition of "take," is defined as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. The definition of "harass" in the ESA regulations includes certain exceptions for captive wildlife:

> This definition, when applied to captive wildlife, does not include *generally accepted*:
>
> (1) *Animal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act*,
>
> (2) Breeding procedures, or
>
> (3) Provisions of veterinary care for confining, tranquilizing, or anesthetizing, when such practices, procedures, or provisions are not likely to result in injury to the wildlife.

Id. (emphasis added).

14

This Court initially held that the Defendants did not "harass" the subject bears because the Defendants' animal husbandry practices complied with the minimum standards for facilities and care under the Animal Welfare Act (AWA), and therefore their animal husbandry practices came within the first enumerated exclusion under § 17.3. On appeal, the Court of Appeals held that this Court improperly construed this regulation:

> The district court interpreted this exclusion to excuse animal husbandry practices that are compliant with applicable AWA standards, without regard to whether those practices are "generally accepted." Plaintiffs urge us to reject this interpretation, explaining that the exclusion can only fairly be interpreted to excuse animal husbandry practices that are both (1) "generally accepted" and (2) AWA compliant. We agree with Plaintiffs' position on this matter.
>
> Plaintiffs' interpretation necessarily follows from the relevant regulatory text. The first enumerated exclusion specifically requires AWA compliance, and it is preceded by a "generally accepted" requirement that applies to the disjunctive list of enumerated exclusions. It is therefore clear that the first enumerated exclusion is comprised of both a "generally accepted" requirement and an AWA compliance requirement.

Hill v. Coggins, 867 F.3d 499, 509 (4th Cir. 2017), cert. denied, 138 S. Ct. 1003 (2018).

15

Accordingly, the Court of Appeals remanded this matter to this Court to resolve two issues:

> To establish harassment in this case, Plaintiffs must prove (1) that the Zoo's animal husbandry practices fall within 50 C.F.R. § 17.3's definition of harass, and (2) that those practices do not fall within the first enumerated exclusion[10] from that definition. The first issue remains unresolved because the district court did not reach it. The second issue remains unresolved in light of our holding that the district court improperly declined to ask whether the Zoo's animal husbandry practices are "generally accepted" before it invoked the first enumerated exclusion.

Id. at 510. The Court of Appeals went on to note that if this Court rules against the Plaintiffs on either one of these issues, it need not address the other issue, as the Plaintiffs "must prevail on both issues in order to establish ESA liability." Id.

The decision of the Court of Appeals construes § 17.3 literally and employs its plain language. This interpretation, however, presents some distinct difficulties for the Court in the application of the regulation to the evidence in this case. More importantly, it presents some significant obstacles for the Plaintiffs in carrying their burden of proof. The problem arises from the application of the constitutional concepts of due process and

---

[10] The second and third enumerated exclusions were not asserted by the parties and are therefore not at issue in this case.

16

the separation of powers to §17.3 as construed by the Court of Appeals in the procedural context presented here.

The Fifth Amendment to the United States Constitution guarantees that an individual's life, liberty or property cannot be taken "without due process of law."  U.S. Const. amend. V.  "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  F.C.C. v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012).  "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."  Connally v. General Constr. Co., 269 U.S. 385, 391 (1926).  "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment."  Fox Television Stations, 567 U.S. at 253.

Requiring "clarity in regulation" is also essential to upholding the separation of powers doctrine.  Article I of the Constitution vests the Congress with "[a]ll legislative Powers" in the federal government.  U.S. Const. art. I, § 1.  The federal courts are assigned the "judicial Power" to hear "Cases" and "Controversies."  U.S. Const. art. III, § 2.  "From this division of duties, it comes clear that legislators may not abdicate their responsibilities

for setting the standards of the criminal law by leaving to judges the power to decide the various crimes includable in a vague phrase." Sessions v. Dimaya, 138 S. Ct. 1204, 12227(2018) (Gorsuch, J., concurring in part and concurring in the judgment) (internal citation and quotation marks omitted).

"The degree of vagueness tolerated in a law depends in part on the type of statute." Manning v. Caldwell, 930 F.3d 264, 272 (4th Cir. 2019). The Supreme Court has held that, in the context of a purely civil statute, less clarity is required because the "consequences of imprecision are qualitatively less severe." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499 (1982). If criminal penalties may be imposed, the Court must apply a stricter standard in reviewing a statute for vagueness. Id. at 498-99; see Johnson v. United States, 135 S. Ct. 2551, 2556 (2015) (noting that criminal statute must give "ordinary people fair notice of the conduct it punishes"); see also United States v. Williams, 553 U.S. 285, 304 (2008) ("A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."). As Justice Gorsuch recently noted, however, "today's civil laws regularly impose penalties far more severe than those found in many criminal statutes." Dimaya, 138 S. Ct. at 1229 (Gorsuch, J.,

18

concurring in part and concurring in the judgment). In light of this, courts have recognized that "laws that nominally impose only civil consequences warrant a 'relatively strict test' for vagueness if the law is 'quasi-criminal' and has a stigmatizing effect." Manning, 930 F.3d at 273; Hoffman, 455 U.S. at 499-500; see also Dimaya, 138 S. Ct. at 1212-13 (applying the most exacting vagueness standard to civil statute authorizing respondent's removal from United States).

Here, the Endangered Species Act clearly has both criminal and civil consequences. "Any person" who knowingly "takes" an endangered or threatened species is "subject to substantial civil and criminal penalties, including imprisonment." Bennett v. Spear, 520 U.S. 154, 170 (1997); see 16 U.S.C. § 1540(a), (b). In addition to authorizing civil and criminal enforcement by the federal government, the ESA also authorizes the enforcement of its substantive provisions and regulations through civil suits brought by individuals, such as the case that is presently before the Court. See 16 U.S.C. § 1540(g)(1)(A) ("any person may commence a civil suit on his own behalf . . . to enjoin any person . . . who is alleged to be in violation of any provision of [the ESA]").

The first significant component of the procedural context here is that, while this is a civil suit, it is at bottom a regulatory enforcement action. The

19

Plaintiffs have demonstrated, and the Court has found, that the Plaintiffs have standing to assert a citizen suit under the ESA. The Court thus has subject matter jurisdiction, as such standing is necessary for there to be an Article III case or controversy. Having established such standing, the Plaintiffs essentially stand in the shoes of the federal government to enforce the provisions of the ESA and its related regulations with respect to these bears.[11] This understanding flows directly from the Supreme Court's opinion in Bennett and the ESA itself. The ESA and its regulations can be enforced both criminally and civilly. Section 17.3 cannot mean one thing when it is the basis of a regulatory enforcement action by the government and mean something materially different when being enforced by plaintiffs such as we find here.

The second significant component of the procedural context presented here is the relief that the Plaintiffs seek. In their prayer for relief, the Plaintiffs seek, *inter alia*, the award of injunctive relief that would require the Defendants "to forfeit possession of all threatened grizzly bears in [their] possession to the United States or an accredited wildlife sanctuary where the grizzly bears are allowed to behave naturally in an environmentally

_____

[11] There is no statutory or common law private right of action under the ESA.

20

stimulating setting that prevents them from being further 'taken.'" [Amended Complaint, Doc. 30 at 11]. Such a remedy effectively would put the Defendants -- who operate a "bear zoo" -- out of business. Moreover, it would operate to effectively forfeit the Defendants' property to the United States or its designee. Given the drastic nature of the relief sought by the Plaintiffs, the Court concludes that a "relatively strict test" for vagueness must be applied to this regulation. <u>See</u> <u>Manning</u>, 930 F.3d at 273 (noting that a "relatively strict test" for vagueness is warranted "if the law is 'quasi-criminal' and has a stigmatizing effect").

As interpreted by the Fourth Circuit, § 17.3 excludes from the definition of "harass," when applied to captive wildlife, animal husbandry practices that are both "generally accepted" *and* meet or exceed the minimum standards of the AWA. <u>See</u> <u>Hill</u>, 867 F.3d at 509 (referring to the "'generally accepted' requirement" and the "AWA compliance requirement"). With respect to the AWA compliance requirement, the minimum standards for the treatment of the subject bears pursuant to the AWA are readily ascertainable. The USDA has promulgated regulations to establish the minimum standards for the treatment of animal held by licensed exhibitors. <u>See generally</u> 9 C.F.R. Ch. I, Subch. A. These regulations provide specific requirements as to all manner of caring for wildlife in captivity, including the type of construction

21

required for sheltering, the type of water and power to be provided, the food supply, storage, waste disposal, washrooms and sinks, temperature control, ventilation, drainage, and shade. In this Court's prior judgment in this matter, the Court found that the Defendants' treatment of the bears did not violate the AWA minimum standards. Neither side has challenged such findings and conclusions, and they remain the law of the case.

In light of the Fourth Circuit's ruling, this Court must now take a further step to examine the evidence for any practice by the Defendants that complies with the AWA, but yet violates § 17.3 where it requires something more, i.e., compliance with "generally accepted animal husbandry practices."

With respect to this "generally accepted" requirement, the compliance waters become quite murky. There is no set of regulations or other guidance promulgated by the FWS or USDA delineating what "generally accepted" animal husbandry practices are with respect to *any* endangered or threatened species, much less grizzly bears. No "generally accepted" animal husbandry practices have been adopted by the ordinary rule-making process or subjected to public debate. There is no single source to which anyone can refer to learn what is allowed and what is prohibited. Indeed, the Plaintiffs have not identified any literature or peer-reviewed material that establishes the "generally accepted" animal husbandry practices applicable

to the treatment of threatened or endangered wildlife in captivity. Instead, the Plaintiffs rely on their experts to provide opinions as to what those "generally accepted" practices are. As such, applying the Plaintiffs' arguments to § 17.3 as construed by the Court of Appeals, renders that section to be something of a regulatory "head-fake." It cites to a formally adopted set of regulations, but then dictates that those regulations are superseded by a higher, more stringent standard that cannot be found in the Code of Federal Regulations or anywhere else.

Even the Plaintiffs' expert Dr. Ramsay candidly admitted that "generally accepted" animal husbandry practices are "subjective" and that there is "very little hard data." [T. 396]. Dr. Ramsay's testimony illustrates how difficult it is to ascertain what the "generally accepted" practice requires with respect to an enclosure for a brown bear subject to the provisions of the ESA. He never testified as to what the standard actually is, or where one would look to find it. Neither Dr. Ramsay nor the Plaintiffs in their other evidence have been able to direct the Court to any clear articulation in any source as to what is lawful and what is not. An expert's subjective opinion of his "reasonable expectation" cannot and does not carry the force of law as a federal regulation. If it did, exhibitors would be left entirely in the dark as to whether they were in regulatory compliance until a non-governmental

23

expert told them so. And even then, reasonable experts could disagree as to what the "generally accepted" practice is. Something more than an expert's "say so" is needed to establish a "generally accepted practice" that has the force of law.

In its decision, the Court of Appeals did not find that the inclusion of the "generally accepted" requirement renders § 17.3 unconstitutionally vague. But as Judge Bailey aptly noted in his dissent in this case:

> As envisioned by the majority, whether an action or inaction on the part of a zookeeper was legal would depend on the current opinion, not codified in any form, of non-government members of certain associations or the general public. Such a framework hardly provides a person with fair warning of what the law intends to do if a certain line is passed. In addition, such a framework violates the separation of powers by allowing non-governmental entities, not legislatures, or even executive officers, define crimes.

Hill, 867 F.3d at 515 (Bailey, J., concurring in part and dissenting in part). Judge Bailey's concerns are well-founded. Such concerns can be squared with the majority's interpretation of § 17.3 only if there is evidence of a clearly articulated, findable, and understandable exposition of a "generally accepted" animal husbandry standard.

The Court of Appeals has expressly remanded this matter directing this Court to apply § 17.3, as construed, to the evidence presented. And this the

Court will now endeavor to do. In order to do so, however, the Court must explore the constitutional parameters of due process and separation of powers as they would apply to the evidence in order to ascertain where the Court and the parties are constrained.

> Vague laws invite arbitrary power. Before the Revolution, the crime of treason in English law was so capaciously construed that the mere expression of disfavored opinions could invite transportation or death. The founders cited the crown's abuse of "pretended" crimes like this as one of their reasons for revolution. Today's vague laws may not be as invidious, but they can invite the exercise of arbitrary power all the same—by leaving the people in the dark about what the law demands and *allowing* prosecutors and *courts to make it up.*

Dimaya, 138 S. Ct. at 1223-24 (Gorsuch, J., concurring in part and concurring in the judgment) (internal citation omitted) (emphasis added). Here, the power to "make it up" resides with Congress and, to the extent that regulatory authority was conferred thereon, the FWS. The Court is therefore constrained in that it does not have the constitutional power to "make . . . up" the "generally accepted" animal husbandry practices which must be followed in order for an exhibitor to comply with § 17.3. The Court cannot *make* the rules. The Court only *applies* the rules that are legislatively made.

The Court is further constrained by the requirement of due process, which mandates, at a minimum, that defendants have fair notice of what is

25

required and what is prohibited under a particular statute or regulation. Therefore, in order for §17.3 to be constitutionally applied, it is incumbent upon the Plaintiffs to prove by a preponderance of the evidence (1) that there is an applicable standard; (2) that it is generally accepted; (3) that the adoption and acceptance of the standard is so widely known as to give the Defendants fair notice of its existence, terms, and requirements; and (4) that the Defendants' acts or omissions violated that standard.

With these requirements in mind, the Court now turns to the evidence of record and makes the following findings. The Plaintiffs presented evidence, primarily through the testimony of Ms. Poulsen and Dr. Ramsay, that the "normal behavioral patterns" for brown bears (including grizzlies) include roaming over multiple square miles, in mostly wooded or forested areas, foraging for a variety of foods. Given the evidence of the wide range of the bears' natural habitat and their foraged diet, it is difficult to conceive of any captive environment which would not be deemed to "significantly disrupt" these normal behavioral patterns to such an extent as to constitute "harassment," but for the exemption for captive animals in § 17.3. While some foraging could be mimicked in a captive setting – such as by the use of enrichment objects, like puzzle feeders – it would be impossible for any

zoo or other facility to provide an enclosure large enough to allow a bear to roam as freely as it does in the wild.

While this might be evidence that *any sort* of captivity of grizzly bears would constitute "harassment" as defined in the first part of § 17.3, that is not the critical inquiry in this case. The Plaintiffs' burden is to show that the treatment of the subject grizzly bears falls outside of the exclusion for captive animals. Thus, at trial it was incumbent upon the Plaintiffs to prove either that the Zoo's animal husbandry practices were not "generally accepted" or that such practices fail to meet the minimum standards of the AWA in order for the Court to conclude that the enumerated exclusion does not apply and that the bears are subject to "harassment" within the meaning of the ESA.

As for the AWA compliance requirement, this Court already has concluded that the preponderance of the evidence demonstrates that the Zoo complied with the AWA minimum standards in caring for the subject grizzly bears:

> The Plaintiffs have failed to prove by a preponderance of the evidence that the pit enclosures fail to comply with 9 C.F.R. § 3.128.[12] The

---

[12] At trial, the Plaintiffs contended that the Zoo's animal husbandry practices do not meet the minimum standards under the AWA. Specifically, they cited one AWA regulation, 9 C.F.R. § 3.128, which was promulgated by the USDA regarding space requirements. The AWA regulations do not contain any specific husbandry practices for grizzly bears or even for bears in general. Rather, bears are covered by the general provisions applicable to

27

pit enclosures are large enough to allow each of the subject bears to make normal postural and social adjustments with adequate freedom of movement. There is no evidence that any of the bears are malnourished, in poor condition, or physically weak. Furthermore, there is no evidence that the bears have exhibited signs of stress or abnormal behavior patterns as a result of the size of their enclosures. In fact, there is no evidence that the bears have exhibited signs of stress or abnormal behavior patterns beyond what any grizzly bear would exhibit as a result of being held in captivity.

The USDA has concluded that the pit enclosures do not violate the provisions of § 3.128 when it has conducted quarterly inspections of the [Zoo]'s facilities, in that it has never cited the [Zoo] for providing inadequate space for the grizzly bears. In fact, the USDA has never cited the [Zoo] for any violation of the AWA. While corrective action has been requested on occasion, the [Zoo] has promptly responded to the USDA's requests. As a result, the [Zoo] has continually maintained its Class C exhibitor license.

[Doc. 93 at 35-36 ¶¶ 39, 40]. The Plaintiffs did not challenge these findings and conclusions on appeal. See Hill, 867 F.3d at 510 n.6 ("As for the district court's finding that the Zoo's animal husbandry practices satisfy the AWA requirement of the first enumerated exclusion, we accept that finding as true, because Plaintiffs have not contested it on appeal."). As such, the Court's

---

elephants, large cats, and other non-primates.

28

prior ruling that the Zoo did not violate the minimum standards of the AWA still stands, and the Court need not address this issue further.

The issue of whether the first enumerated exception applies, therefore, comes down to whether the Zoo's animal husbandry practices are "generally accepted." On this point, the Plaintiffs again rely on the testimony of Ms. Poulsen and Dr. Ramsay.

Dr. Ramsay opined that the AZA Accreditation Standards, and particularly the provisions of Section 10.3.3 of such Standards, are considered the "generally accepted" animal husbandry practices for zoos.[13] The AZA Accreditation Standards on which Dr. Ramsay relies, however, are created by a voluntary zoological association and do not have the force of law. Less than 10% of the approximately 2,800 exhibitors licensed by the USDA are accredited by the AZA. Dr. Ramsay did not explain how standards that are met by so small a minority of exhibitors are "generally accepted." Moreover, these are *accreditation* standards, by which exhibitors are certified by and become members in an elite voluntary organization. By their

---

[13] Dr. Ramsay also testified that the North Carolina regulations pertaining to the care of captive blacks also informed his opinion regarding the "generally accepted" animal husbandry practices applicable to the subject grizzly bears. Dr. Ramsay admitted, however, that these regulations, which require at least an acre of space for two bears, set forth requirements that *exceed* the "generally accepted" practice. Therefore, Dr. Ramsay's opinion that the Zoo's pit enclosures failed to comply with these state regulations is not probative of whether the Zoo's practices are "generally accepted."

29

own definition, such standards are *not* generally accepted. The Plaintiffs, however, take this even further, by arguing that these accreditation standards have the force of law as a result of being silently incorporated into § 17.3. The Plaintiffs fail to explain how some 90% of exhibitors fail to meet such standard if it truly is what the law requires.[14] Indeed, when asked on cross-examination about what evidence he had to support his opinion that the AZA Accreditation Standards were generally accepted, Dr. Ramsay admitted that could not point to anything -- other than statements to this effect advertised by the AZA itself. The Court is not required to accept the *ipse dixit* of the Plaintiffs' experts. See General Elec. v. Joiner, 522 U.S. 136, 146 (1997).

The Plaintiffs' other expert, Ms. Poulsen, testified that the Zoo's animal husbandry practices do not comply with the AZA Accreditation Standards. Significantly, however, Ms. Poulsen never identified the AZA Accreditation Standards as being the "generally accepted" standard for animal husbandry practices. Evidence that the Zoo did not comply with a more stringent animal husbandry standard is meaningless unless it is also established that this

---

[14] Dr. Ramsay testified that many non-accredited facilities meet or even exceed the AZA Accreditation Standards. However, other than referencing one elephant sanctuary in Tennessee [see T. 332], he did not provide any factual support for this assertion.

more stringent standard is *also* one that is "generally accepted."  On that particular point, Ms. Poulsen fails to establish that the AZA Accreditation Standards are the "generally accepted" standard for animal husbandry practices applicable to threatened or endangered captive animals.[15]

For these reasons, the Court finds as fact and concludes as a matter of law that the AZA Accreditation Standards are not the standard of "generally accepted" animal husbandry practices within § 17.3.  Rather, these standards cited by the Plaintiffs' experts represent, at most, an aspirational standard.

Even if the AZA Accreditation Standards could be looked to as the standard for "generally accepted" animal husbandry practices, such standards at best establish a moving target.  The AZA Accreditation Standards themselves note that AZA-accredited zoos and aquariums are "continuously evolving."  Association of Zoos & Aquariums, Accreditation Standards and Related Policies, at 5 (2015 ed) [Pls. Ex. 84].  Indeed, as Dr. Ramsay noted, the standards of practice are continuously developing, to the

---

[15] Ms. Poulsen further testified that the Zoo's animal husbandry practices failed to comply with the standards of the international zoological community.  As she failed to do with the AZA Accreditation Standards, however, Ms. Poulsen offered no evidence that the international standards of practice have been so widely known and generally accepted here in the United States as to constitute "generally accepted" animal husbandry practices subject to enforcement under § 17.3.

31

point that, in his opinion, "virtually every zoo and every captive animal enclosure today needs to be renovated every 20 years." [T. 382]. In fact, Dr. Ramsay conceded that the concrete pits in which the subject bears are housed and the public feeding to which they are subjected were once accepted common practices "many years ago," but are no longer considered acceptable. [T. 248-49, 382]. If concrete pits and public feedings were once "generally accepted," at what point did they become *not* "generally accepted" and thus violate § 17.3? And how are licensed exhibitors provided any notice that their animal husbandry practices are no longer considered "generally accepted"? The Plaintiffs presented no evidence to answer these crucial questions.

While Ms. Poulsen and Dr. Ramsay identified numerous ways in which the Zoo's animal husbandry practices failed to meet the aspirational standards set by the AZA and the more stringent standards followed by some other facilities, they have failed to demonstrate that those higher standards are "generally accepted." Moreover, the Plaintiffs' experts did not cite any learned treatise, published literature, scholarly writing or peer-reviewed material in support of their conclusion that the Zoo's animal husbandry practices are not "generally accepted." A close examination of these experts'

testimony reveals that they failed to present a sufficient factual basis for their opinions regarding "generally accepted" animal husbandry practices.

As the Court previously stated, in order for §17.3 to be constitutionally applied, it was incumbent upon the Plaintiffs to prove by a preponderance of the evidence (1) that there is an applicable standard; (2) that it is generally accepted; (3) that the adoption and acceptance of the standard is so widely known as to give the Defendants fair notice of its existence, terms, and requirements; and (4) that the Defendants' acts or omissions violated that standard. For the reasons set forth above, this Court finds and concludes that the Plaintiffs have failed to demonstrate by a preponderance of the evidence that there is a "generally accepted" animal husbandry standard that was so widely known as to give the Defendants fair notice about what they were required to do in order to comply. The Court further finds and concludes that the Plaintiff have failed to demonstrate by a preponderance of the evidence that the Defendants' acts or omissions constitute a failure to act in accordance with a "generally accepted" standard for animal husbandry practices. The Court therefore concludes as a matter of law that the first enumerated exception to § 17.3 applies, and the Defendants' treatment of the four grizzly bears does not constitute "harassment" within the meaning of the ESA.

33

### 2. "Harm"

Having determined that the Defendants did not "harass" the subject bears, the Court now turns to the issue of whether the bears were subject to "harm."

"Harm," as used in the definition of "take," is defined as "an act which *actually kills or injures wildlife*. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by *significantly impairing* essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3 (emphasis added). A mere potential for future injury is insufficient to establish a "harm." Rather, there must be a showing that an actual injury has occurred or is reasonably certain to occur in the imminent future. See Sweet Home, 515 U.S. at 702-03; Marbled Murrelet v. Pacific Lumber Co., 83 F.3d 1060, 1068 (9th Cir. 1996); American Bald Eagle v. Bhatti, 9 F.3d 163, 166 (1st Cir. 1993); Animal Welfare Inst. v. Beech Ridge Energy LLC, 675 F. Supp. 2d 540, 562 (D. Md. 2009); Strahan v. Holmes, 595 F. Supp. 2d 161, 164 (D. Mass. 2009).

Here, the Plaintiffs have failed to demonstrate by a preponderance of the evidence that the Defendants' treatment of the four grizzly bears at the Zoo constitutes "harm" as that term is defined in the ESA and the applicable regulations. Specifically, the Plaintiffs have failed to demonstrate that the

34

Defendants' animal husbandry practices resulted in any death or actual injury to the subject bears or that death or injury is reasonably certain to occur in the imminent future.

While the Plaintiffs' experts expressed concern that the public feeding of the bears could allow for foreign objects to be swallowed by the bears or for the communication of diseases, no such injuries have in fact occurred. That such harm may *potentially* occur if the practice is continued is not sufficient to establish a "harm" within the meaning of the regulation.  See Sweet Home, 515 U.S. at 702-03; Marbled Murrelet, 83 F.3d at 1068; American Bald Eagle, 9 F.3d at 166; Animal Welfare Inst., 675 F. Supp. 2d at 562; Strahan, 595 F. Supp. 2d at 164.  Further, the Plaintiffs' experts opined that the bears suffered hair loss as a result of the stress created by the conditions of the pit enclosures. The Defendants' veterinarian, Dr. Ackerman, opined, however, that such hair loss was in fact seasonal and was effectively treated with medication on a regular basis.  The Court credits Dr. Ackerman's testimony in this regard.

Finally, while Ms. Poulsen testified that the conditions of the bears' confinement caused abnormal behavioral patterns in the bears, such as pacing, the Plaintiffs have failed to provide any evidence that such behavior was exhibited on such a regular basis as to be considered an "injury."  They

further have failed to show that such pacing behavior would not otherwise exist with captive brown bears in other settings.

Based on the foregoing, the Court finds and concludes that the Plaintiff have failed to prove by a preponderance of the evidence that the Defendants significantly impaired any of the grizzly bears' essential behavioral patterns such as feeding or sheltering. Accordingly, the Court concludes as a matter of law that the Plaintiffs have failed to establish that the bears were subjected to "harm" such that a "taking" occurred within the meaning of the ESA.

## IV.    CONCLUSION

Neither the ESA nor the regulations promulgated pursuant thereto give USDA-licensed exhibitors any means of discerning whether their animal husbandry practices comply with the "generally accepted" standard within the meaning of 50 C.F.R. § 17.3. Because there is a dearth of regulatory guidance, determining whether an exhibitor is in compliance can be made only when a citizen suit is brought, and experts are brought in to testify regarding the "generally accepted" practices, leaving the courts to determine the scope and breadth of the generally accepted standards. Such a system not only raises serious separation of power concerns but also fails to provide licensed exhibitors fair notice of what is required of them under the ESA.

36

Assuming that this interpretation of § 17.3 is constitutional, however, the Court concludes that the Plaintiffs have failed to prove by a preponderance of the evidence that the Defendants did not comply with "generally accepted" animal husbandry practices or with the minimum standards of the AWA. As such, the Court concludes that the Defendants' conduct falls within the first enumerated exclusion of 50 C.F.R. § 17.3 and therefore does not constitute "harassment" within the meaning of the ESA. The Court further concludes that the Plaintiffs have failed to prove that the grizzly bears were subjected to "harm" within the meaning of the ESA. Accordingly, the Court concludes that there has been no "taking" and thus no violation of the ESA with respect to the four grizzly bears in question. Therefore, the Plaintiffs' claims will be dismissed.

## O R D E R

**IT IS, THEREFORE, ORDERED** that this action is hereby **DISMISSED WITH PREJUDICE** in its entirety, and the Defendants shall recover their costs of the action from the Plaintiffs.

A Judgment consistent with this Memorandum of Decision and Order shall be filed contemporaneously herewith.

**IT IS SO ORDERED.**     Signed: September 24, 2019

Martin Reidinger
United States District Judge